Good morning, Your Honors. My name is Darrell Manhart. I represent the appellants, sheriff and detention officers. And if there's time, I'd hope to have two or three minutes for rebuttal at the end. If I can address the sheriff part first, because I'm assuming we're going to want to talk more about the detention officers. Sheriff Arpaio is entitled to qualified immunity in this case because a reasonable sheriff could believe that generalized statements indicating a get-tough attitude on crime without, could make such statements without knowing that more than five years later such an incident as occurred with Mr. Axter would happen. Would you mind speaking just a little louder? I'm losing some of the... I'm very sorry, Your Honor. And with respect to the detention officers, if I could try to summarize that up in a statement, too. Having no intent to punish and rational purposes to lean Mr. Axter forward, both to put him in the restraint chair for his own welfare and to maintain institutional security, coupled with no notice while he's being leaned over that he's having any difficulty or suffering any harm, the detention officers were also entitled to qualified immunity. And there's three pages in particular in the district court's order that I would specifically like to direct attention to on the detention officers. Pages 11, then 33, then 16. And on page 11, Your Honors... Hold on. Hold on. Certainly, Your Honor. We get half credit for being prepared, but we need the time to find the page. I'm sorry. Okay. I've got it. Page 11, Your Honors, is... Just one second. Everybody... Should I wait? Yes, please. Okay. Okay. On page 11, Your Honors, is where the district court identifies the two things considered to support the excessive force claim. One, plaintiff's counsel said that Charles Axter was kneed repeatedly in the stomach by a detention officer so as to deprive him of oxygen. And two, plaintiff's counsel argued that detention officers contorted Charles' body to remove the handcuffs and cut off his oxygen supply. And with respect to that first one, plaintiff's claim on the knee should promptly be eliminated. First of all, because there's no evidence to support that. All of the record references to a knee in the bend come from Mr. Manning, plaintiff's counsel's questions to witnesses. Officer Roush specifically said bend referred to where the top of the thigh... All of you are in seated positions right now. Your thigh is bent where it joins your hip. That is where Mr. Roush indicated. All of his testimony was that he placed pressure on the thigh. All of the other officers who were specifically asked said they only saw pressure placed on the thigh. There's no evidence of a knee in the stomach. There's also... It says middle of the body. Pardon? It says middle of the body. It does on page 11, Your Honor. Yeah, that's where you directed us. There are other references in the order that refers to abdomen or stomach, and that's plaintiff's argument in their brief. There's also no evidence in anything plaintiff presented that the so-called knee in the bend cut off any oxygen. So there's no evidence to support that part at all. Moving on to the other part, the argument... Well, wait a minute. Maybe by parsing it the way you're doing it, you're not helping your argument much. But at least reading on page 11, as I read, the district court said the officers, five of the officers contorted his body until they cut off his oxygen supply, one part, and kneed him repeatedly in the middle of his body. And you just said, well, there's no evidence that the kneeing led to cutting off oxygen. But I don't think that's what the district court was finding in any event. This is an excessive force claim. And the question is whether piling on by five officers, as reflected in the video, could be reasonably seen by a jury as excessive force. Your Honor, I can't remember now whether that's one sentence or two that's on page 11. Well, I'm reading it, and you cited it to us. So if you don't have it in front of you, it might be useful if you did. It specifically refers to cutting off his oxygen supply. That's what I said. I'm reading it. Until they cut off his oxygen supply and kneed him repeatedly in the middle of his body. The second sentence, there's two sentences there on line six through nine, or the rest of that paragraph. All three of them talk about deprivations of oxygen. It says the third sentence, these two deprivations of oxygen. Right. They're all based upon claims that the knee and the contorting cut off the oxygen supply. But this is also, that may be, but he's also talking about force. This is an excessive force claim. Yes, Your Honor. And if I, I hope I answer it by moving on. Well, I'm not sure how kneeing in the stomach would cut off oxygen supply unless it, you hit somebody and it causes them to lose their breath. I agree, Your Honor, but that's. All right. So take your point. But the claim there. There's an ambiguity, and you think that's, we should rule out the kneeing as having. That is correct, Your Honor. Are you ruling out the other cause? I'm moving on to that one now, Your Honor. And if you look at that other one, if you go to page 33 of the order, on page 33, the district court granted summary judgment eliminating that any custom of leaning forward to remove handcuffs was per se excessive force. I believe it's down around, lines around. I'm sorry, Mr. You're paying. I'm sorry. Page 33. 33. Right. And your point on that is. The significance, Your Honor, is that the detention officers are not held to know that merely leaning forward an inmate is necessarily going to cause any problem for that inmate, that that's excessive force. You have to have some notice in a particular situation that it's causing harm, that it has passed some noticeable point that it has become excessive force. Merely leaning him forward is not excessive force. Right. That seems to be what the district court's saying, though. It's not always excessive force. But in this instance, there's a genuine issue of material fact as to whether it was. Your Honor, let me take you back to page 16 now. On page 16, I'll tell you the line it's on, if I may. Line 7. The sentence is, It is undisputed that Nurse Lewis was present during the entire period plaintiff's claim Mr. Axter was showing distress. Now, the evidence in the record is that Nurse Lewis stepped away while they were actually placing him in the chair. She was a few feet away behind a door. But she returned after he was seated in the chair and secured. And that's when she began checking the restraints. So this is after he's been leaned back up. So the first sign of him showing distress is after Nurse Lewis has returned. This is also going to be reflected in the other appeal you're going to hear today. And, in fact, in the athlete's answering brief in that other appeal, I believe the specific time the plaintiff's referred to is around between 1210 and 1211 on the video surveillance clock, which is after Nurse Lewis has been for a few minutes making her checks. If the first notice of distress by Mr. Axter is after they've already leaned him up, then there was no notice during the time he was leaned over of any distress. There being no notice of any distress, plaintiffs cannot show any basis for these officers to be deprived of qualified immunity. They had a rational basis for placing him in the chair, no punitive intent, no notice that he was in any distress. And I see I've gone past when I was hoping to say some rebuttal on that, Your Honor. Okay. Do you want to say the rest of your time? Yes. Thank you. All right. Good morning, Your Honors. Mike Manning on behalf of the Axter family. I was asked by the Axter family to use a moment of my precious ten minutes to thank the panel for expediting this appeal. Mr. Axter and his wife are elderly. Mr. Axter is sick. This case was supposed to go to trial in February, but, of course, this appeal stayed that. I'd like to address a couple points made by the appellants in particular. First of all, no evidence of knees into Mr. Axter's midsection. Of course, there is evidence in the record. It is in the video. More importantly, or as importantly, it is in Officer Rausch's statement that this 300-pound man took his knee into Mr. Axter's midsection and thrust it into his midsection three times. As the Court knows, Mr. Axter was a 125-pound, 5'5 man of slight build who those officers knew was sick, and they knew he had not been properly admitted into this jail. So whether or not that knee deprived Mr. Axter of oxygen is immaterial in the 1983 analysis, I believe. It still caused him harm, evidently caused him harm. It doesn't need to deprive him of oxygen. They deprived him of oxygen by bending him forward. And I think what may not be clear from our briefs, and I think is essential in the 1983 analysis here, is that when they bent Mr. Axter forward and held him in that position for a minute and 47 seconds, the record shows there was utterly, absolutely no need to do that. Why? Because the three officers said in their statements that are in this record on appeal that they took one side of the cuff off immediately. One cuff was already off. With nine DOs, jailers around this man, they could have lifted him up, strapped that one free arm into the chair, maybe even the cuffed arm, and taken the cuff off then. Instead of holding him forward for a minute and 47 seconds, utterly, absolutely no rational basis, nothing more than excessive force. This case trumps the Graham analysis and the Gibson analysis with respect to what these people did. This is excessive force squared. Just a couple of the factors. There were nine jailers on this 125-pound man. He was clearly ill. They knew he was ill. They thought he was a 90. There were nine jailers. What do you mean by that? I'm sorry, Your Honor. There were six DOs and three supervisors. But how many were actually participating in the physical contact with him? Evidence in the record is eight. All at the same time? No. Not all at the same time. Well, I mean, doesn't that make a difference? Your Honor, it does. It would if this were just a hands-on excessive force. But just like Lieutenant Kemper, an officer has a duty to intervene and do something if he or she is witnessing excessive force on a detainee. That assumes there's excessive force. So you said there were nine officers on this lightweight, harmless man. I mean, that creates an image that you've got a group of nine burly deputies jumping all over him. And that's a fair point. It's not quite what was going on. That is a fair point. Not all of them, at every moment in that video, is holding that man down. That's correct. But all of them, at one point or another, except one. Are you arguing, just so I can understand the parameters of your argument, although it's hard to see what's going on, there's clearly one of the deputies, a female deputy, is holding his head back and upright. Is that something you're arguing is excessive force? Yes, Your Honor. We're arguing that that's excessive force, that this man, who was not properly admitted to the jail, had not been given medical screening. He was not. Well, that may be. But what was the excessive force? She's got his hand on his head, and you're arguing that when he's kneeled forward and bent over and pushed down, that's when his oxygen is cut off. And yet she seems to be keeping him upright, so there wouldn't be positional effects here. At least that would be one interpretation. That is one interpretation of part of what she did. Now, that's Officer Brockschmidt, I think, and she also participated in additional – before she's holding his head – I didn't ask you about other things. I'm just trying to get a sense from your description of your case, so that we know whether – what it is about your case that falls into the exception to qualified immunity. So my question was, when she's holding him back, sitting in the chair, which you can see, there may be other things going on. I don't know. I'm just talking about the video. Is that excessive force, or is that reasonably keeping his head upright to permit him to continue breathing properly? The actions would argue that that is both excessive force and not intervening when she knew she had a duty to intervene to stop the excessive force. But again, just so I'm clear, that particular officer at other points in the video participated in holding him down. I wasn't asking about that. Okay. But putting him in that chair at all, they knew he was mentally impaired. They knew he was clearly ill. They knew he was a man of slight build, 125 pounds. They probably didn't know the exact weight, but they knew that he was a very small man. Importantly, they knew he was noncombative. In the record, it is – no one in that record on the defense side ever said we were at any point in time afraid or thought that he was resisting, not at any point in this record. The defense did not put anything in the record to show that they were at any point concerned about their safety or the safety of others. Also, I don't think our brief made it well clear. It is in the record, however, that they violated at least five of their own policies when they chaired Charles. They violated the intake process with the pre-booking, which is DO-1, that they said that every DO knows that every inmate must have a medical screening done of his admittance. They did not. The DOs were taught that under DQ-3, they must refer inmates to the correctional health psychiatric staff, which is not Nurse Lewis. If any inmate exhibits bizarre behavior, Charles did. They were told to use verbal control before they put him in a chair. They did not. But what's the relation of those policies, which seem sensible, to the liability of a sheriff? Well, our position of the sheriff is supervisory and municipal liability under 1983. I know, but aren't these his policies? They are his policies, Your Honor. So to that extent, they help him. I think to that extent, they help him. These are good policies. They're common-sense policies. All right. So you've got all that policy, and against that, what do you have against the sheriff? Well, that's that. I'm glad that Corey asked on that. Our notorious sheriff in Phoenix, Arizona, the self-described toughest sheriff in America, has publicly stated that he wants his jails to be, quote, places of punishment. He wants to, quote, educate through punishment, close quotes. He has said, boasted that he runs, quote, very bad jails, close quotes. Now, the defense will tell you, the appellants here will tell you, that those jails have convicted personnel in them as well, but they're mostly non-convicted detainees. The sheriff has created an atmosphere of brutality and excessive force in this jail, and this is most evident in this case here, where they took this man, who they knew was pitifully sick, pitifully small, put him in that chair and held him forward for utterly no reason. They got one handcuff off immediately and left him bent over while they took the second one off. So that's the liability on the sheriff. I guess you're not arguing ratification. Pardon me? You're not arguing ratification on his part. Well, we are, Your Honor, arguing ratification. That's not our vanguard argument here. Our vanguard argument against the sheriff is supervisory municipal liability created a culture of cruelty by public statements both to the public, but more importantly to the detention officers. Has there been any proffer of evidence on your part other than the facts of this case, which you claim are cruelty, and the public statements to show that anybody else in this jail has been subjected to any kind of excessive force? Only some other cases that are notorious cases down in Phoenix. Those are part of the record? I believe we have two of them that are. Didn't we cite two of them? I don't think we did. So, Your Honor, we did not. Okay. What we have are uncontested, except to say that I think the appellant said that, well, Mr. Arpaio said that with respect to convicted inmates, but there's no segregation in these jails. They're convicted and detainees. Places of punishment. So, two seconds. Any questions? No. Thank you, Your Honor. Did you on the sheriff address where you raised the qualified immunity arguments as to him? I'm sorry? As to the sheriff. When and where did you raise the qualified immunity arguments as to Sheriff Arpaio that you're urging before us now? That's extensively covered, I hoped, in the reply brief, Your Honor, where we go through and point out that in the original complaint of the plaintiffs, they didn't identify any particular acts by the sheriff. So we included the sheriff with all the detention officers. And when they came back in their response to that qualified immunity motion, they specifically limited what they said about the sheriff then. It was only in addressing the what I'll call the global or substantive summary judgment motion that the plaintiffs first identified the statements that Mr. Manning referred to today. So that was our first opportunity, and we addressed those in our reply on the substantive summary judgment motion. The district court didn't think that that was adequate. That's what the district court said, Your Honor. Regarding Mr. Manning's statements about Royce, if you look at pages 187 to 90 of his deposition, 211 to 213, he does not say what Mr. Manning says about the need to the midsection. I would disagree with Mr. Manning about the Graham analysis trumping anything here. I acknowledge that the Gibson opinion from this Court refers to Graham in a detainee, I believe, case, but I submit that Graham says that it's an arrest and investigatory stop case and specifically says that there's no generic rule for Section 1983 cases and comes up with its test for the arrest investigatory stop. I'm sorry, I have trouble saying that word, situation. If you look at Bell v. Wolfish, which is a detainee case, many years earlier, though, that talks about rational basis, and unless there's shown an intent to punish, as opposed to a rational basis for restraint or restriction, that it's not excessive force. I guess I'm out of time, Your Honors. Thank you very much. Thank you for your argument. Well, next to your argument in the second case in these consolidated appeals, Agster v. Lewis.
judges: Noonan, Thomas, Fisher